# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **VIRGINIA NATURAL GAS, INC.** | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Civil Action No. 3:21-cv-00066-MHL |
| **C4GT, LLC,** | ) ) ) |
| Defendant. | ) ) |

### DECLARATION OF KENNETH W. YAGELSKI IN SUPPORT OF VIRGINIA NATURAL GAS, INC.'S MOTION FOR DEFAULT JUDGMENT

I, Kenneth W. Yagelski, declare as follows:

1. My name is Kenneth W. Yagelski, and I am Director of Gas Supply for AGL Services Company ("AGSC"). I am responsible for gas supply activities for the AGSC distribution operations, which include Virginia Natural Gas, Inc. ("VNG"). In addition, I direct business advocacy in proceedings before the Federal Energy Regulatory Commission on behalf of Southern Company Gas ("SCG"), and its four local distribution companies. Since 1985, I have been employed in the natural gas and electric power industry with various management positions and as a consultant to the North American energy industry. In 2012, I joined SCG as Director of Gas Supply Policy, and in September 2014, I assumed my current position. In this position, I have substantial involvement in and oversight of all aspects of VNG's gas-supply activities and customer relationships, and I work principally out of VNG's headquarters in Virginia Beach, Virginia.

2. I make this Declaration on personal knowledge and if called as a witness could and would competently testify as to the matters stated herein. This Declaration is based upon my personal knowledge, VNG's business records, and information available from VNG's employees.

I am very familiar with the Virginia Natural Gas Header Improvement Project (the "Project") and the October 3, 2019 Virginia Natural Gas Header Improvement Project Precedent Agreement (the "Precedent Agreement") between VNG and C4GT, LLC ("C4GT"). I served as VNG's primary liaison with C4GT, led our company's negotiations with C4GT, and managed our company's overall relationship with C4GT. I also actively participated in discussions surrounding the termination of the Precedent Agreement.

3. In particular, I am familiar with and was personally involved in VNG's calculation of the Customer Reimbursement Amount pursuant to the Precedent Agreement. I am also very familiar with the process VNG used to translate the Project cost data onto the October 21, 2020 Invoice (the "Invoice," Compl. Ex. 8) and the cost-to-date-analysis containing a breakdown of Project costs (the "Cost-to-Date Analysis"), both of which VNG provided to C4GT on October 21, 2020. The Cost-to-Date Analysis provided to C4GT is attached hereto as Exhibit 1.

4. VNG tracked the Project's costs in a detailed Microsoft Excel spreadsheet entitled "Master Forecast." The Master Forecast utilized a work breakdown structure, meaning it organized work associated with the Project by breaking it down into smaller, categorized components. The Master Forecast captured costs by referring to contracts with suppliers and verifying actual dollars spent—including internal charged amounts—using PeopleSoft, VNG's accounting system of record. The Project costs in the Master Forecast were recorded, reconciled, and audited regularly. The Master Forecast, reflecting the breakdown of each individual Project cost, is attached hereto as Exhibit 2.

5. To calculate the Customer Reimbursement Amount, VNG retrieved the Project costs through the end of September 2020 from the Master Forecast. In other words, the costs and

cost categories were directly translated from the Master Forecast to the Invoice and Cost-to-Date Analysis.

6. The Precedent Agreement provided that the Customer Reimbursement Amount, which reflects C4GT's proportionate share of the Project costs, would be calculated based on C4GT's majority share of the Project's Maximum Daily Contract Quantity ("MDCQ"). Accordingly, VNG applied the amount of C4GT's majority share to the total Project costs from the Master Forecast to formulate the Customer Reimbursement Amount for the Invoice and the Cost-to-Date Analysis.

7. The Invoice, Cost-to-Date Analysis, and Master Forecast were prepared at or near the time of the occurrence of the matters set forth therein by, or from information transmitted by, a person with knowledge of those matters; were kept in the course of VNG's regularly conducted business activity; and were made as a regular practice during VNG's regularly conducted business activity. The Invoice, Cost-to-Date Analysis, and Master Forecast are true and correct copies of the original business records prepared and kept by VNG in the ordinary course of business. The cost amounts reflected in the Invoice, Cost-to-Date Analysis, and Master Forecast are true and accurate representations of the information reflected in VNG's systems of record. Specifically, the costs on the Invoice and Cost-to-Date Analysis were drawn directly from VNG's Master Forecast spreadsheet, which was prepared and kept in the course of VNG's regularly conducted business activities and contains the raw data underlying the Invoice and Cost to Data Analysis.

8. VNG did not need to cancel or terminate contracts with vendors or other contracts due to the termination of the Precedent Agreement, so no cancelation or termination costs were charged to C4GT.

9. In compliance with the Precedent Agreement, VNG made reasonable efforts to limit the Project costs to those necessary to support its application for a certificate of public convenience and necessity ("CPCN"), which involved a single application and proceeding for the entire Project, not just for C4GT. But because the Project as to C4GT never reached the stage of procuring materials and supplies, there were no costs for VNG to mitigate by returning, canceling, selling, or reassigning materials and supplies. Accordingly, while VNG limited the Project costs to those necessary for the CPCN, there were no mitigation amounts to subtract from the costs charged to C4GT.

10. The scope of the Project, and therefore the scope of the cost categories reflected in the Invoice and Cost-to-Date Analysis, were directly dependent and predicated upon C4GT's commitment under the Precedent Agreement. Had C4GT not made that commitment, VNG's infrastructure-expansion plan would have been significantly different. As expressly contemplated by Paragraph 10(a) of the Precedent Agreement, VNG incurred certain costs to develop the Project as a direct result of C4GT's commitment to the Project pursuant to the Precedent Agreement. Those costs comprise the Customer Reimbursement Amount and are set forth in the Invoice and Cost-to-Date Analysis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: May 5, 2021

Kenneth W. Yagelski